## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**KEYSTONE SPORTS AND ENTERTAINMENT LLC,** *et al.*

      *Plaintiffs,*

**v.**

      **No. 2:21-cv-00609-PBT**

**FEDERAL INSURANCE COMPANY**

      *Defendant*.

## FIRST AMENDED CIVIL ACTION COMPLAINT

Plaintiffs, Keystone Sports and Entertainment LLC; FC Pennsylvania Stadium LLC; Pennsylvania Professional Soccer LLC; Rivertown Developers, L.P.; Rivertown TCI, L.P.; and KSE U2 LLC (collectively "Plaintiffs"), file this First Amended Complaint for declaratory judgment and breach of contract against Defendant Federal Insurance Company ("Federal") alleging the following:

## I.     INTRODUCTION

1. This action for declaratory judgment and breach of contract arises out of Defendant's failure to comply with its obligations and provide insurance coverage for Plaintiffs' claims under an "all-risks" insurance policy, Customarq Series Customarq Classic Insurance Program Policy Number 3594-16-31 PHL, which was sold by Defendant Federal Insurance Company to Plaintiffs (the "Policy").

2.      Plaintiffs' business is conducted in Subaru Park, an 18,500-seat stadium located at One Stadium Drive, Chester, Pennsylvania 19013; the training fields immediately outside of Subaru Park; the Training Facility located at 2525 Seaport Drive, Chester, Pennsylvania 19013, and an office building located at 2501 Seaport Drive, Chester, Pennsylvania 19013. Each of the insured locations are collectively referred to herein as the "Insured Locations," " the premises," or the "covered properties."

3.      Subaru Park is a world-class event space that hosts Major League Soccer, in addition to numerous other sporting events, concerts, entertainment events, private special events, training clinics, camps and tours. Subaru Park is the home of Major League Soccer's Philadelphia Union, the winner of the 2020 Supporters' Shield (a major trophy given to the team with the best regular season record). The multipurpose event facility features twenty-nine luxury suites, a full-service club restaurant, which opens on event days, and a built-in concert stage.

4.      The Philadelphia Union Major League Soccer team trains, studies, and practices at the Training Facility for its matches and games. The Philadelphia Union also holds public training sessions at the Training Facility, where fans watch the team practice, and where sponsors pay for advertising space and other active marketing opportunities in order to advertise to those fans. Likewise, fans can purchase merchandise, food and beverages in Subaru Park and sponsors pay significant sums for advertising space throughout Subaru Park.

5.      The Policy provides business interruption coverage for business income and other related losses caused by "direct physical loss or damage." Due to COVID-19,[1] Plaintiffs' properties suffered "direct physical loss or damage" under the plain and ordinary meaning of that

---

[1] The terms for the virus ("SARS-CoV-2," "the coronavirus, and the "virus"), and the term for the disease that it causes COVID-19) are used interchangeably herein and should be read in context for reference to the virus, the disease, or both. For simplicity, COVID-19 is used as the predominant term.

term. Plaintiffs suffered "direct physical loss or damage" because COVID-19 impaired Plaintiffs' properties. Plaintiffs were unable to use Subaru Park and the Insured Locations in the manner they were used before the onset of the COVID-19 pandemic[2].

6.      COVID-19 physically infested the Insured Locations. Thus, instead of being able to pack fans into Subaru Park and the training fields to enjoy soccer and other sporting events, concerts, entertainment events, private special events, training clinics, camps, and tours, during the 2020 season, Plaintiffs had to keep the properties closed, and upon reopening, had to substantially limit public attendance. Instead of allowing the Philadelphia Union team to study, work out, train, practice for their soccer matches and host public training camps, Plaintiffs had to keep the Training Fields and Facility completely closed for a considerable period of time. Plaintiffs still operated at a significantly reduced capacity at the Training Fields and Facility through June 23, 2021. Even then, despite the advent of and widespread administration of vaccines, masking was required and socially distanced seating available.

7.      These losses are direct—Plaintiffs are not asking Defendant for reimbursement after someone obtained a judgment against them for getting them sick. That might be an indirect loss. Rather, Plaintiffs are asking Defendant to pay for their loss of business income occasioned directly by the inability to use their properties due to the actual presence and continued threat of COVID-19. COVID-19 was not only a substantial factor in causing the loss. It was the predominant, principal, or immediate factor in causing the loss or damage: COVID-19 was close in proximity

_____

[2] Note, however, that Plaintiffs are not seeking recovery for their loss of use. Plaintiffs are seeking coverage for their loss of business income. By way of example, some law firms were unable to use their office space because of COVID-19, but nevertheless the law firms' business income increased, and they faced no loss of business income. A claim by such a law firm for not being able to use its office space would be a "loss of use" claim. But the law firm would have no loss of *business income* claim. Here, Plaintiffs' business stalled because of the impairment of their business spaces, and Plaintiffs are seeking the loss of business income under the business interruption coverage of their property insurance policy.

to the loss or damage, such that any ordinary person would think that the loss or damage was in the zone of danger of COVID-19.

8.      These losses are physical. The Insured Properties lost at least part of their functionality and most of their ability to generate revenue. The presence of the virus and related probability of illness prevented the use of the Insured Locations in their normal way in no less of a way than, on a rainy day, a crumbling and open roof from the aftermath of a tornado would make the interior space of a business unusable. The difficulty of observing COVID-19, combined with its high transmissibility and persistence in the air and on surfaces, means that air and surfaces within the properties remain impacted even after cleaning efforts, and these air and surfaces may quickly become reinfected when individuals enter the premises.

9.      Moreover, the SARS-CoV-2 virus that causes COVID-19 is physical—it can be seen, counted, measured, and destroyed; it replicates itself and destroys other cells and organisms. Importantly, it can exist in the air and on surfaces for indeterminate periods of time, and it can be transferred from the air and surfaces into human bodies. COVID-19 was physically present at the Insured Properties and rendered their use dangerous.

10.     These losses are losses under the Policy. They result from the loss of functionality of the spaces otherwise available for the purpose of generating business income. The losses reflect the diminishment of physical space. What once could hold tens of thousands of raucous and energetic fans could subsequently hold very few fans, and, even upon reopening, what once could hold both professional and amateur athletes training to perfect their skills held only limited training of athletes in the same space at the same time. What once sold merchandise to tens of thousands of paying customers could then sell to only a mere fraction of those customers.

11.    These losses constitute damage. A physical virus was present in and around Plaintiffs' facilities, impairing their function for their ordinary and intended uses, forcing their closure, and requiring steps to be taken to physically restore the facilities to a usable state. Due to the COVID-19 pandemic, there was an actual or threatened physical impact on the Insured Locations including the airspace within the premises. Due to the extreme threat of continued infestation as the pandemic spiked, receded, and then spiked again, and the impact of COVID-19 on the utility and function of the covered properties, Plaintiffs suffered multiple millions of dollars in loss.

12.    Numerous Philadelphia Union athletes and staff that were present at the Insured Locations tested positive for COVID-19.[3]

13.    Insurers around the country are asking federal and state judges to interpret the words "direct physical loss or damage," but those words need no interpretation. What insurers want is for courts to change the meaning of those terms—instead of just letting a jury apply the facts of the case to these ordinary words and reach a verdict in the same way a jury would reach a verdict if it were called upon to answer whether a person was injured, or property was damaged.

14.    Over the course of decades, courts have held that the presence of a dangerous (to humans) invisible substance at or on a property, including within the airspace of covered premises, constitutes "physical loss or damage" to property. Many courts have also held that the restriction of use of property due to an imminent risk of danger to its inhabitants constitutes "physical loss" to property.[4] The coverage provided by property policies covering business income loss has

_____

[3] Plaintiffs cannot, at this time, publicly disclose the identity of those who have tested positive for COVID-19 due to HIPAA regulations.
[4] *See, e.g.*, Richard P. Lewis, Lorelie S. Masters, Scott D. Greenspan & Chris Kozak, *Couch's 'Physical Alteration' Fallacy: Its Origins and Consequences*, 56 Tort & Ins. L. J. 621 (Fall, 2021).

continually been expanded since inception to cover "loss" exposures beyond actual damage or destruction to property.[5]

15.    Prior to the onset of the COVID-19 pandemic, courts throughout the country adopted the contamination theory in recognizing that the existence of odors, bacteria, and other imperceptible agents such as ammonia, salmonella, lead, e-coli bacteria, and carbon-monoxide, may constitute "physical loss or damage" to a property if its presence renders the structure uninhabitable or unusable, or essentially destroys its functionality. *See e.g., Mellin v. Northern Security Ins. Co., Inc.*, 167 N.H. 544, 548, 550, 115 A.3d 799, 803, 805 (2015) (finding that the pervasive odor of cat urine was "physical loss to the property," and concluding that "'physical loss need not be read to include only tangible changes to the property that can be seen or touched, but can also encompass changes that are perceived by the sense of smell," and hold[ing] that "physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage."); *Azalea. Ltd. v. American States Ins. Co.*, 656 So.2d 600, 602 (Fla. Ct. App. 1995) (reversing trial court decision to find that a direct physical loss had been established after an unseen contaminant entered the insured's sewage treatment system and destroyed the bacteria colony that was integral to its operation); *Arbeiter v. Cambridge Mut. Fire Ins. Co.*, 1996 WL 1250616, at *2 (Mass. Super. 1996) ("The existence of fumes may be a physical loss. The plaintiffs argue persuasively that fumes are a physical loss which attaches to the property.").

16.    In fact, there have been numerous court rulings across the country and in Pennsylvania holding that insureds have properly alleged or are in fact entitled to coverage for coronavirus-related business interruption loss or damage. *See*, *e.g.*, *Studio 417, Inc. v. Cincinnati*

---

[5] *See* Expert Report of Charles M. Miller ("Miller Declaration") publicly filed in the matter: *R&J Ent. LLC et al. v. HCC Specialty Insurance Company*, No. 4:20-cv-03782 (S.D. Tex. Aug. 5, 2021).

*Insurance Company*, 478 F. Supp. 3d 794 (W.D. Mo. Aug. 12, 2020); *cf. Mudpie, Inc. v. Travelers Casualty Insurance Company of America*, 487 F.Supp.3d 834, 842 n. 7 (N.D. Cal. Sep. 14, 2020), aff'd, 15 F.4th 885 (9th Cir. Oct. 1, 2021) ("Had Mudpie alleged the presence of COVID-19 in its store, the Court's conclusion about an intervening physical force would be different. SARS-CoV-2 … is no less a 'physical force' than the 'accumulation of gasoline' in *Western Fire* or the 'ammonia release [which] physically transformed the air" in *Gregory Packaging.*'"). *See also Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds London*, No. 00375, 2020 WL 6380449, at *1 (Pa. Com. Pl. Oct. 26, 2020) ("physical loss or damage" cannot be adjudicated based on preliminary objections, because it is a factual issue to be determined by the trier of fact.); *Ridley Park Fitness, LLC v. Philadelphia Indem. Ins. Co.*, No. 01093, 2020 WL 8613467, at *1, n.1 (Pa. Com. Pl. Aug. 31, 2020) (Insurer preliminary objections overruled, holding that, where defendant insurer asserted there was no "direct physical loss," it would be "premature" to "resolve the factual determinations put forth by defendant to dismiss plaintiff's claims."(Glazer, J.).

17.   This has been the rule of law in the Third Circuit for years.[6]

18.   Because numerous courts agree that contamination by an imperceptible agent, such as the coronavirus and/or COVID-19, may cause "direct physical loss or damage" to property, Plaintiffs' interpretation of the Policy and expectation of coverage is more than reasonable and consistent with that of similarly positioned and reasonable policyholders.

19.   Plaintiffs entered into an insurance contract with Defendant Federal. Although the Policy provides coverage for business interruption and related losses due to physical loss or

---

[6] *See Port Authority of New York and New Jersey v. Affiliated FM Insurance Co.*, 311 F.3d 226, 235 (3d Cir. 2002) (the Court acknowledged that "physical loss" under a  commercial property policy can be established where the imminent release of an invisible substance into the airspace of a covered property presents a significant enough health hazard to people occupying the premises that it impairs the building's function or utility.); *see also Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826 (3d Cir. 2005) (An issue of fact existed as to whether e-coli in the well water used by a homeowner had sufficient enough impact on the function and use of the home to constitute direct physical loss or damage).

damage to property, Defendant has reneged on its obligations. Defendant relied on its own inapplicable exclusions and its own internal schemes to limit or altogether deny Plaintiffs from the recovery to which they are entitled. Plaintiffs paid considerable premiums in full and relied on the Policy as a shield against unforeseen loss or damage and the resulting loss of income. Yet, instead of following through on its end of the bargain, Defendant has failed to honor its duties under the Policy.

## II.   <u>**THE PARTIES**</u>

20.   Plaintiff Keystone Sports and Entertainment LLC is organized under the laws of the State of Delaware, with its principal place of business at 2501 Seaport Drive, Suite BH100, Chester, Pennsylvania 19013, and is an additional Named Insured under the Policy. *See* Policy No. 3594-16-31 PHL, attached hereto as **Exhibit 1**, at 188.

21.   Plaintiff FC Pennsylvania Stadium LLC is organized under the laws of the State of Delaware, with its principal place of business at One Seaport Drive, Chester, Pennsylvania 19013, and is a Named Insured under the Policy. See id. at 10 & 188.

22.   Plaintiff Pennsylvania Professional Soccer LLC is organized under the laws of the State of Delaware with its principal place of business at 2501 Seaport Drive, Suite BH100, Chester, PA 19013, and is an additional Named Insured under the Policy. *See id.* at 188.

23.   Plaintiff Rivertown Developers, L.P., is organized under the laws of the State of Pennsylvania with its principal place of business at 2501 Seaport Drive, Suite BH100, Chester, Pennsylvania 19013, and is an additional Named Insured under the Policy. *See id.*

24.   Plaintiff Rivertown TCI, L.P. is organized under the laws of the State of Pennsylvania with its principal place of business at 2501 Seaport Drive, Suite BH100, Chester, Pennsylvania 19013, and is an additional Named Insured under the Policy. *See id.*

25.    Plaintiff KSE U2 LLC is organized under the laws of the State of Delaware with its principal place of business at 2501 Seaport Drive, Suite BH100, Chester, Pennsylvania 19013. KSE U2 LLC is a covered entity under the Policy because it is a wholly owned subsidiary of Keystone Sports and Entertainment LLC, an additional Named Insured. *See id.*

26.    Defendant Federal Insurance Company is incorporated under the laws of the State of Indiana, with a principal place of business located at 251 North Illinois, Suite 1100, Indianapolis, Indiana 46204. Federal is authorized to do business and issue insurance policies in the Commonwealth of Pennsylvania.

### III.    JURISDICTION AND VENUE

27.    Subject matter jurisdiction exists over this matter pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, which may be invoked to interpret the obligations of the parties under an insurance contract.

28.    This court has personal jurisdiction over Defendant Federal, because it transacted and continues to transact in the business of selling insurance within the Commonwealth of Pennsylvania and has purposefully availed itself of this jurisdiction, the subject matter, and the parties.

29.    Venue is proper in this court because the original action was properly filed in the Pennsylvania Court of Common Pleas in Philadelphia County. Additionally, the obligations under the contract at issue were to be performed, at least in part, in Philadelphia County.

### IV.    FACTUAL BACKGROUND

30.    The Policy covers the Insured Locations at Subaru Park, an 18,500-seat stadium located at One Stadium Drive, Chester, Pennsylvania 19013; the training fields outside of Subaru Park; the Training Facility located at 2525 Seaport Drive, Chester, Pennsylvania 19013; and the

office building located at 2501 Seaport Drive, Chester, Pennsylvania 19013. The Insured Locations are world-class sports and entertainment facilities and related training facilities and office space. Subaru Park and the adjacent training fields can host a variety of events in addition to professional soccer games, including concerts, tailgates, and community activities. Subaru Park operated continuously from its construction in 2010 through mid-March of 2020, when it was forced to close its doors to paying customers and cancel events due to the actual infestation and continued threat of COVID-19 and the resultant orders issued by governmental authorities. Subaru Park then reopened at limited capacity in October 2020. It was not until June 23, 2021 that Subaru Park opened at near full capacity but with safety restrictions remaining in place.

31.   Prior to the COVID-19 pandemic, Subaru Park would routinely host the Army-Navy soccer game, Collegiate Rugby Championship, lacrosse, and other major ticketed events, but these events had to be canceled due to COVID-19 and the subsequent civil authority orders.

32.   In addition, the Philadelphia Union regularly hosted youth programs including clinics, camps, and tournaments at the Training Facility.

33.   Federal is an insurance company that sold an insurance policy to Plaintiffs providing coverage to Plaintiffs against business income loss incurred resulting from "direct physical loss or damage[7]. . ."  The Policy had an effective term of July 1, 2019 to July 1, 2020.

34.   For the premises located at 2501 Seaport Drive and One Stadium, the Policy provides blanket limits of $168,772,890 for building, personal property and electronic data processing coverage and Business Income With Extra Expense Coverage limits of $18,000,000. The Business Income With Extra Expense Coverage is split into two sub-sections entitled "Premises Coverages" and "Additional Coverages."  In pertinent part, the Premises Coverages include but are not limited

---

[7] Although the Policy includes some coverage exclusions, none of the exclusions are applicable to Plaintiffs' claims.

to "Ingress and Egress Coverage," and the Additional Coverages include but are not limited to Civil Authority and Dependent Business Premises Coverage.

35.    For the office building located at 2501 Seaport Drive, the Policy provides Business Income with Extra Expense Coverage with limits of $4,815,016.

36.    The Policy provides an additional $1,000,000 in Blanket Limits for the Premises Coverages which includes but is not limited to sub-limits of $250,000 per location in extra expense coverage; and $25,000 per location in loss prevention coverage. *See* **Exhibit 1** at 21-24.

37.    The Policy also provides Dependent Business Premises coverage with limits of $250,000 per occurrence and Ingress or Egress coverage with limits of $50,000 per occurrence. *See id. at* 26-27.

38.    In exchange for Federal's agreement to take on Plaintiffs' risk of loss, Plaintiffs paid substantial premiums for the Policy from July 1, 2019 to July 1, 2020. Plaintiffs paid or tendered all consideration required under the Policy, including payment of premium.

A.    **COVID-19 Is a Highly Contagious and Deadly Communicable Disease**

   *1.    The Coronavirus and the COVID-19 Pandemic*

39.    COVID-19, a disease resulting from the SARS-CoV-2 novel coronavirus, is a deadly communicable disease that has already infected approximately 78.9 million people in the United States and killed more than 950, 000 Americans.[8]

40.    Until recently, with the advent and administration of the COVID-19 vaccines to individuals across the globe, the spread of and risk of the spread of the virus at Plaintiffs' Insured Locations, when used for their intended function, was a near certainty, especially where people gathered in packed crowds to cheer on their team and worked close together.

---

[8] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last viewed March 3, 2022).

41.     On March 11, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a pandemic.[9] On March 13, 2020, President Trump declared a national emergency due to the outbreak in the United States.[10]

42.     The time between exposure to the coronavirus and first symptoms, otherwise known as the incubation period, for COVID-19 can last up to 14 days.[11] Some COVID-19 patients show symptoms, and some are asymptomatic. Even asymptomatic persons can transmit COVID-19 for an extended period of time, thought to be even longer than 14 days.[12] In fact, studies have estimated that over 40% of infected individuals may never develop symptoms, yet still spread Coronavirus through physical droplets.[13] Those people who eventually show symptoms can also spread the disease even in their pre-symptomatic state.[14]

### 2.   COVID-19 on Surfaces and in the Air

43.     COVID-19 can exist on surfaces for days. COVID-19 remains active on plastic and stainless-steel surfaces for up to three days, on cardboard for 24 hours, on copper for four hours, and is detectable in aerosols for up to three hours.[15]   When COVID-19 attaches to and adhere on

---

[9] *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last viewed February 14, 2022).

[10] *See* https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last viewed February 14, 2022).

[11] *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html#:~:text=The%20incubation%20period%20for%20COVID,CoV%2D2%20infection (last viewed February 14, 2022).

[12] *See* https://www.acpjournals.org/doi/10.7326/M20-3012 (last viewed February 14, 2022).

[13] *See, e.g.,* Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected* (May 27, 2020, 1:43 PM)*,* https://www.nbcnews.com/health/healthnews/asymptomatic-covid-19-cases-maybe-more-common-suspected-n1215481 (last viewed February 14, 2022).

[14] *See* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last viewed February 14, 2022).

[15] *See* https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days (last viewed February 14, 2022).

surfaces and materials, it becomes a part of those surfaces and materials, converting the surfaces and materials to fomites.[16]

44.    Aerosol transmission is believed to be a common mode of transmission in many settings. Aerosols can be generated through simple breathing, as well as heavier breathing while, for example, exercising at a health club. According to research published in The Journal of the American Medical Association, a person who sneezes can release a cloud of pathogen-bearing droplets that can span as far as 23 to 27 feet.[17] If a person is infected with SARS-CoV-2, whether symptomatic or asymptomatic, infectious viral particles will be aerosolized into the air through their breathing. Infection clusters suggest that aerosol, droplet, and fomite transmission explain SARS-CoV-2 transmission amongst humans.

45.    The consensus among researchers, the Center for Disease Control and Prevention ("CDC") and WHO is that a predominant mode of transmission of the coronavirus and/or COVID-19 is through the air.[18] Scientists have recently confirmed that infections can be prevented through improved ventilation and better indoor air quality guidelines to cover airborne pathogens.[19] For example, a study in the *Science* journal issued on May 14, 2021 "suggest[s]that the rapid growth in our understanding of the mechanisms behind respiratory infection transmission should drive a paradigm shift in how we view and address the transmission of respiratory infections to protect against unnecessary suffering and economic losses."[20]

---

[16] *See* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last viewed February 14, 2022).
[17] *See* https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited February 14, 2022).
[18] Jason Gale, *Covid-19 Is Airborne, Scientists Say. Now Authorities Think So, Too,* Bloomberg (May 16, 2021), https://www.bloomberg.com/news/articles/2021-05-16/covid-is-airborne-scientists-say-now-authorities-think-so-too (last visited February 14, 2022).
[19] *Id.*
[20] Lidia Morwaska, et al., *A paradigm shift to combat indoor respiratory infection, Science* (May 14, 2021), https://science.sciencemag.org/content/372/6543/689 (last visited February 14, 2022).

46.     The WHO updated its guidance as of December 23, 2021, stating, *inter alia,* that "[t]he virus can also spread in poorly ventilated and/or crowded indoor settings, where people tend to spend longer periods of time. This is because aerosols remain suspended in the air or travel farther than 1 metre (long-range)."[21]

47.     Airborne viral particles are known to spread into a building's HVAC system, leading to transmission of the coronavirus from person to person. One study found the presence of the coronavirus within the HVAC system servicing hospital ward rooms of COVID-19 patients. This study detected SARS-CoV-2 RNA in ceiling vent openings, vent exhaust filters, and central ducts that were located more than 50 meters from the patients' rooms.[22]

48.     Researchers identified "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) on surfaces days or weeks after the virus is deposited, making it difficult to estimate when an infected individual may have shed virus onto a SARS-CoV-2-positive surface, which in turn complicates the process of establishing effective quarantine measures."[23]

49.     Based on these and other studies, the Environmental Protection Agency ("EPA") recommended that buildings make improvements to their HVAC systems by, for example, increasing ventilation with outdoor air and air filtration.[24]

50.     The CDC updated the guidance for fully vaccinated people. The guidance includes making improvements on HVAC systems to insure the maximization of ventilation. The CDC also recommended adding portable air cleaners that use high-efficiency particle air filters to enhance

---

[21] *Coronavirus Disease (COVID-19): How is it transmitted?,* WHO (updated December 23, 2021), https://www.who.int/news-room/q-a-detail/coronavirus-disease-covid-19-how-is-it-transmitted (last visited February 14, 2021).

[22] *See* https://www.researchsquare.com/article/rs-34643/v1 (last visited February 14, 2022).

[23] Rodolfo A. Salido, et al., *Analysis of SARS-CoV-2 RNA Persistence across Indoor Surface Materials Reveals Best Practices for Environmental Monitoring Programs*, 6(6) mSystems e0113621 (Nov 2021; https://journals.asm.org/doi/10.1128/mSystems.01136-21).

[24] *See* https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19 (last visited February 14, 2022).

air cleaning and ultraviolet germicidal irradiation as a supplemental treatment to inactivate the virus.[25]

51.  The scientific fact that SARS-CoV-2 alters the structure of property shown in the preceding paragraphs, and is further proven from recent scientific studies that identify and measure the physical changes to property that occur when the virus encounters property, as follows:

   a.  The "coronavirus" terminology stems from the spike protein that is stationed along the attack edge of the virus, where the spike protein is ready for chemical battle. Nature purpose-built the spike protein to chemically bond the virus to anything physical that the virus encounters, including property. The spike protein "represents a viral fusion protein with a club-like shape of approximately 25 nm in length, as confirmed by cryo-EM measurements."[26]

   b.  Nature equipped the spike protein with a positive charge that arms the spike protein to chemically attack any surface with a negative charge, including metal, wood, cotton, and glass. Opposites attract, and a chemical bond is made between virus and property whenever virus encounters property. The chemical bond that the spike protein causes between the virus and property is a structural alteration of property. Amino acids in the spike protein drive absorption onto "solid surfaces through double electrostatic interactions" between the ionized spike protein "and the oppositely charged surfaces."[27] In addition, there may also be "hydrogen bonding

---

[25] *See* https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/ventilation.html (last visited February 14, 2022).
[26] Adamcyzk, *et al*., SARS-CoV-2 virion physicochemical characteristics pertinent to abiotic substrate attachment Figure 1, Current Opinion in Colloid & Interface Science (Vol. 55 Jun 2, 2021), available at https://tinyurl.com/2m6pf7e9.
[27] Joonaki, *et al*., Surface Chemistry Can Unlock Drivers of Surface Stability of SARS-CoV-2 in a Variety of Environmental Conditions, at 2137, CHEM (Sept. 10, 2020), available at https://tinyurl.com/2vpwdezx.

based on the surface characteristics."[28] The hydrogen bonding that the spike protein

causes between the virus and property is a structural alteration of property.

    **c.**  The spike protein also increases the roughness of the surface of property when it

chemically bonds to the surface of property. The increased roughness that the virus

inflicts upon property is another structural alteration of property caused by the

virus. "After spike protein adsorption, all the surfaces become rough with the

obvious binding of spike protein."[29]

    **d.**  The spike protein also makes property more water repellent (*i.e.*, more

hydrophobic) when it chemically bonds to the surface of property. The increased

hydrophobic state of property is another structural alteration of property caused by

the virus.

    52.   The scientific studies further prove that the spike protein on the attack edge of the

virus physically alters the air in the property, which contains particulate matter. In particular, spike

proteins bond to minerals, soot, and plastics found in particulate matter.[30] The spike protein

structurally alters the particulate matter in the air of the property when it chemically bonds with

the particulate matter in the air of those spaces.

    53.   The spike protein of the virus caused the virus to structurally alter the Covered

Property through chemical bonding, hydrogen bonding, increased roughness, and increased

hydrophobic state. The spike protein of the virus also structurally altered the air in Plaintiff's

headquarters and restaurants through the same chemical bonding, hydrogen bonding, increased

---

[28] *Id.*

[29] Xie, *et al*., A Nanochemical Study on Deciphering the Stickiness of SARS-CoV-2 on Inanimate Surfaces, ACS Appl Matter Interfaces (Dec. 30, 2020), available at https://tinyurl.com/yy7x3x92.

[30] Duval, *et al*., Chemodynamic features of nanoparticles: Application to understanding the dynamic life cycle of SARS-CoV-2 in aerosols and aqueous biointerfacial zones, Adv. Colloid Interface Sci. (Apr. 2021), available at https://tinyurl.com/v3t9b36e.

roughness, and increased hydrophobic state of the particulate matter in the air of Plaintiff's property.

### 3. *COVID-19 is Not Eliminated by Routine Cleaning*

54. The presence of COVID-19 at a property further causes physical loss and damage by necessitating remedial measures to reduce or eliminate the presence of cases of COVID-19.

55. The damage to property caused by persons with COVID-19 is not limited to the duration that infection from a single source remains present. A recurrent cycle of infection via the air, infectious surfaces, and contact between an infected person and others will further damage property, thus resulting in sustained property damage. Mere cleaning and disinfecting of the property and the air does not repair or remediate the actual physical and tangible alteration to property caused by the coronavirus and/or COVID-19, nor does it transform the property from its unsafe, hazardous, and potentially deadly condition.

56. Even extraordinary cleaning measures do not remove the coronavirus from surfaces. For example, a 2021 study by the largest hospital network in New York State demonstrated that even after trained hospital personnel used disinfection procedures in the coronavirus patient treatment areas, much of the virus survived in those areas – proving that even intense, non-routine surface cleaning does not remove it from surfaces – let alone from the air.[31]

57. A number of studies have demonstrated that the coronavirus is "much more resilient to cleaning than other respiratory viruses so tested."[32] The measures that must be taken to remove the coronavirus from property are significant and go far beyond ordinary or routine cleaning. A

---

[31] Zarina Brune et al., *Effectiveness of SARS-CoV-2 Decontamination and Containment in a COVID-19 ICU*, 18 INT'L J. ENV'T RSCH. & PUB. HEALTH 5, 2479 (Mar. 3, 2021), https://www.mdpi.com/1660-4601/18/5/2479 (last visited February 24, 2022).

[32] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://doi.org/10.1002/jmv.26170 (last visited February 14, 2022).

study by the Northwell Health System concluded that even the decontamination procedures recommended by the WHO for intensive-care units were not effective at removing SARS-CoV-2, and in particular were ineffective against aerosolized particles.[33] Moreover, courts have rejected the argument that the coronavirus does not alter the property because it can be removed by cleaning.[34]

58.   Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents. Efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, contact time with the decontaminating agent, dilution, temperature, and pH, among many others. Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[35] Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[36]

59.   The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[37]

60.   Critically, cleaning surfaces will not remove the aerosolized coronavirus particles from the air that can be inhaled and cause people to develop COVID-19[38]—no more than cleaning

---

[33] Zarina Brune, Cyrus E. Kuschner, Joseph Mootz, Karina W. Davidson, Robert C. F. Pena, Mustafa H. Ghanem, Austin Fischer, Michael Gitman, Lewis Teperman, Christopher Mason, and Lance B. Becker, 18 Int J Environ Res Public Health. 5, 2479 (Mar. 3, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7967612 (last visited February 14, 2022).

[34] *See e.g., Derek Scott Williams PLLC et al. v. The Cincinnati Ins. Co.*, Case No. 20 C 2806, N.D. Il. Feb. 28, 2021).

[35] *Id*.

[36] Joon Young Song et al., *Viral Shedding and Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 254-55 (Dec. 2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited February 14, 2022).

[37] *Id*.

[38] Zarina Brune, Cyrus E. Kuschner, Joseph Mootz, Karina W. Davidson, Robert C. F. Pena, Mustafa H. Ghanem, Austin Fischer, Michael Gitman, Lewis Teperman, Christopher Mason, and Lance B. Becker, 18 Int J Environ Res Public Health. 5, 2479 (Mar. 3, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7967612/ (last visited February 14, 2022).

friable asbestos particles that have landed on a surface from that surface will remove the friable asbestos particles suspended in the air that people can inhale and develop asbestos-related diseases. Nor will routine cleaning prevent an infected person from entering the property and exhaling the coronavirus particles and virions into the air and surrounding environment. What was and is necessary to repair airspace and surfaces within a premises to address the dangers of the spread of the coronavirus requires factual and expert input and analysis.

61.     In fact, the CDC released guidance stating that there is little evidence to suggest that routine use of disinfectants can prevent the transmission of the coronavirus from fomites in community settings.[39] The CDC concluded that according to a more quantitative microbial risk assessment study, "surface disinfection once-or twice-per-day had little impact on reducing estimated risks" of the coronavirus transmission.

62.     The presence of the virus, whether circulating or stagnant, has changed the object, surface, or premises, in that it has become dangerous to handle and/or enter, and cannot be used without remedial measures. Its use can only be restored with remedial action and sufficient time for the contaminated air to be evacuated, as suggested by infectious disease experts.

### 4. The Variants

63.     Since the inception of the pandemic, state and local governments took additional drastic actions in an effort to curb the spread of COVID-19. Several of the continued to restrict indoor dining, established curfews for bars and restaurants, and limit table seating.

64.     The Delta, Epsilon, and Omicron variants swept across the globe, infecting people at a rapid and accelerating rate.

---

[39] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited Dec. 7, 2021).

65. The rise of the Omicron variant fueled yet another separate and distinct wave of the coronavirus, causing physical loss of or damage to the Insured Locations.

66. Alarmingly, the virus variants infect even the immunized members of the public.

67. The L452R mutation of the SARS-CoV-2 spike protein, which is common to both the Epsilon and Delta virus variant strains, is involved in cellular immunity evasion via the human leukocyte antigen (HLA) A24 and enhances viral infectivity. [40]

68. The virus strains of the variants are more infectious than the original virus strain. Thus, even as immunizations and boosters increase, COVID-19 will continue to infect members of the public and will continue to be present at the Insured Locations and cause physical loss or damage to the Insured Properties.

69. Each outbreak caused by novel variants of COVID-19 and each period of infestation caused by COVID-19 and its variants is a separate and distinct occurrence under the Policy.

70. The presence of cases of COVID-19 at a property causes physical loss and damage by rendering a property that is usable and safe for humans into a property that, absent remedial measures, is unsatisfactory for use, uninhabitable, unfit for its intended function, and extremely dangerous and potentially deadly for humans.

**B.** **Plaintiffs' Employees and Athletes Contracted COVID-19 and Were Present at the Insured Locations, Causing the Insured Locations to Close**

71. In early March 2020, the Philadelphia Union reported that one of its athletes had tested positive for COVID-19. This was the first positive COVID-19 case in all of Major League Soccer.[41]

---

[40] See *SARS-CoV-2 spike mutation L452R evades human immune response and enhances infectivity, researchers find*, https://www.sciencedaily.com/releases/2021/07/210720114413.htm.

[41] See https://www.usatoday.com/story/sports/mls/union/2020/04/01/coronavirus-philadelphia-union-player-first-mls-case-covid-19/5109563002/ (last viewed February 14, 2022).

72.     Thereafter, additional Philadelphia Union athletes and staff members tested positive for COVID-19 in 2020 and 2021. These athletes and staff members were present at the Insured Locations on multiple locations during the time period leading up to their positive test results. Individuals who came into contact with persons diagnosed with COVID-19 were also present at the Insured Locations on various dates in 2020 and 2021.

73.     Upon information and belief, individuals who were asymptomatic or pre-symptomatic and unknowingly carrying the coronavirus including team members, coaches, staff, employees, and fans were present at the Insured Locations in 2020 and 2021.

74.     Consequently, droplets and aerosols containing the coronavirus spread from infected individuals to surfaces and the HVAC systems throughout the Insured Locations, thereby causing physical damage and alteration to property and harming the air quality therein.

75.     Due to the extreme threat posed by COVID-19, Major League Soccer suspended all league and team activities on March 12, 2020.[42]

76.     Due to the confirmed COVID-19 cases and confirmed COVID-19 presence at the Insured Locations, it became necessary to close Subaru Park, the adjacent practice fields, and Training Facility that comprise the Insured Locations on March 12, 2020. The staff that works in the office building was also sent home.

77.     The Insured Locations were closed due to the presence of COVID-19.

78.     Even after Subaru Park first reopened to Philadelphia Union fans in a limited 15% capacity on October 11, 2020, the combined number of fans permitted all season was less than one game's worth of fans in a regular season. Subaru Park hosted numerous games at reduced capacity in 2021.

---

[42] *Id.*

C.     **Federal, State, and Local Governments Issued Civil Authority Orders Because of COVID-19**

79.     Due to the highly-contagious nature of COVID-19, in an effort to slow the spread of COVID-19, *and as a consequence of physical loss or damage caused by COVID-19*, federal, state, and local governments issued orders limiting the amount of people who could congregate in a group, requiring many businesses to close, and ordering individuals to stay-at-home, except for "essential" activities like going to the grocery store or going to a doctor for an urgent medical issue ("the Closure Orders").

80.     Under the Closure Orders, businesses that were deemed "non-essential" were required to be close, with their employees working from home (if they were able to work at home, depending on the type of business—if not, they could not work).

81.     Mass gatherings were restricted under applicable Closure Orders.

82.     The first confirmed cases of COVID-19 in Pennsylvania were reported on March 6, 2020.[43]

83.     On March 19, 2020, Pennsylvania Governor Tom Wolf issued an indefinite Executive Order prohibiting the operation of businesses that are not "life sustaining." The Order prohibited the operation of any place of business in the Commonwealth of Pennsylvania that is not a life sustaining business regardless of whether the business is open to members of the public. Plaintiffs' Insured Locations were covered by this March 19, 2020 Executive Order.[44]

---

[43] *See* https://www.ydr.com/story/news/2020/03/06/coronavirus-in-pa-first-covid-19-case-confirmed-in-pennsylvania-wayne-delaware-county/4966026002/ (last visited February 14, 2022).

[44] *See* https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (last visited February 14, 2022).

84.     The March 19, 2020 stay-at-home order required individuals residing in Allegheny, Bucks, Chester, Delaware, Monroe, Montgomery, and Philadelphia counties stay at their places of residence.[45]

85.     The March 19, 2020 Executive Order was subsequently amended to include residents of numerous other Pennsylvania counties and was to stay in effect through April 30, 2020.[46]

86.     On April 1, 2020, the Pennsylvania Secretary of the Department of Health instituted a Stay-at-Home order for all persons residing in the Commonwealth of Pennsylvania.[47]

87.     On April 5, 2020, the Pennsylvania Secretary of the Department of Health issued orders requiring building safety measures and cleaning protocols/guidelines that all businesses which were permitted to remain open had to abide by. These measures were in direct response to the actual presence of COVID-19 and the grave threat to health and safety presented by COVID-19.[48]

88.     On April 25, 2020, Governor Wolf announced reopening metrics that called for a phased reopening by region after a region satisfied certain metrics, such as having fewer than fifty new confirmed cases per 100,000 people in the preceding fourteen days.

---

[45] *See* https://www.governor.pa.gov/newsroom/governor-wolf-and-health-secretary-issue-stay-at-home-orders-to-7-counties-to-mitigate-spread-of-covid-19/#:~:text=Rachel%20Levine%20today%20issued%20%E2%80%9CStay,continue%20until%20April%206%2C%2020 (last visited February 14, 2022).
[46] *See* https://www.governor.pa.gov/newsroom/gov-wolf-and-sec-of-health-expand-stay-at-home-order-to-carbon-cumberland-dauphin-and-schuylkill-counties-extend-school-closures-indefinitely/#:~:text=Rachel%20Levine%20revised%20their%20%E2%80%9CStay,will%20continue%20until%20April%2030 (last visited February 14, 2022).
[47] *See* https://www.governor.pa.gov/newsroom/gov-wolf-sec-of-health-pennsylvania-on-statewide-stay-at-home-order-beginning-at-8-pm-tonight-most-prudent-option-to-stop-the-spread/#:~:text=The%20statewide%20stay%2Dat%2Dhome,business%20closures%20remain%20in%20effect.&text=Staying%20at%20home%20means%20you%20must%20stay%20at%20home.%E2%80%9D (last visited February 14, 2022).
[48] *See* https://www.governor.pa.gov/wp-content/uploads/2020/04/20200405-SOH-Building-Safety-Measures.pdf (last visited February 14, 2022).

89.     On May 1, 2020, Governor Wolf announced that twenty-four counties would begin to reopen as of May 8, 2020—Delaware County, where the Insured Locations are located, was not among the counties permitted to reopen.[49]

90.     It was not until June 4, 2020, that Delaware County was included among the counties that could begin to reopen, albeit in a significantly limited capacity and with stringent social distancing requirements.[50]

91.     On July 15, 2020, Governor Wolf issued an Executive Order Directing Mitigation Measures, which included a ban on outdoor gatherings of more than 250 and on indoor gatherings of more than 25 for any business outside the retail food services industry.[51] On October 6, 2020, Governor Wolf amended this July 15, 2020 order and laid out maximum occupancy restrictions which crippled Plaintiffs' ability to utilize their Insured Locations.[52]

92.     Plaintiffs were not able to reopen Subaru Park to fans until October 11, 2020 and at extremely limited capacity. Plaintiffs were absolutely prohibited from accommodating their pre-COVID-19 number of paying customers.

93.     On November 27, 2020, Governor Wolf issued an order that forbid all indoor events with more than 500 people. This order required businesses to have their employees work remotely, if possible.

94.     Pursuant to a March 1, 2021 Order of the Acting Secretary of the Pennsylvania Department of Health amending the November 23, 2020, Order of the Secretary of the

---

[49] *See* https://www.governor.pa.gov/newsroom/gov-wolf-announces-reopening-of-24-counties-beginning-may-8/ (last visited February 14, 2022).

[50] *See* https://www.governor.pa.gov/wp-content/uploads/2020/06/20200604-TWW-amendment-to-yellow-phase-order.pdf (last visited February 14, 2022); https://www.governor.pa.gov/wp-content/uploads/2020/04/20200415-SOH-worker-safety-order.pdf (last visited February 14, 2022).

[51] *See* https://www.governor.pa.gov/wp-content/uploads/2020/07/20200715-TWW-targeted-mitigation-order.pdf (last visited February 14, 2022).

[52] *See* https://www.governor.pa.gov/wp-content/uploads/2020/10/20201006-TWW-amendment-to-targeted-mitigation-order.pdf (last visited February 14, 2022).

Pennsylvania Department of Health for Mitigation and Enforcement, the maximum occupancy limits for indoor events regardless of venue size was 15%. Distancing and masking requirements were mandatory thereunder.

95.     Starting in April of 2021, the Governor of Pennsylvania eased the occupancy limits on events and gatherings, which allowed the Plaintiffs to host outdoor events at Subaru Park at 50% capacity, with the caveat that six feet of social distancing be maintained between any persons who were not members of the same household. Given the distance between rows and seats at Subaru Park, this meant that Plaintiffs could only offer for sale approximately 25% of the available seats at Subaru Park for home soccer matches. Plaintiffs hosted 6 matches at Subaru Park when such restrictions were in place.

96.     As of May 17, 2021, the Governor of Pennsylvania eased the occupancy limits on events and gatherings again, which allowed the Plaintiffs to host outdoor events at Subaru Park at 75% capacity. This meant that Plaintiffs could only offer for sale approximately 35% of the available seats at Subaru Park for its home soccer matches. Plaintiffs hosted one match at Subaru Park when such restrictions were in place.

97.     Subaru Park finally reopened at full capacity to fans on Wednesday, June 23, 2021. Even at the time, numerous mitigation measures remained in place. Steps were taken to reduce exposure to contact points through the use of mobile tickets and parking passes and the ability to purchase concessions by debit or credit card.

98.     As a result of these orders, Subaru Park and Plaintiffs' other Insured Locations had to remain closed. None of Plaintiffs' businesses were or are considered "essential" or "life sustaining" under any of the Closure Orders.

99.   Ultimately, with the limited exception of a handful of watch parties held with significantly reduced capacity during the July 2020 season tournament which were *not* ticketed revenue driving events, Plaintiffs were unable to reopen Subaru Park or its Insured Locations until October 11, 2020. Even when they did open Subaru Park to fans on October 11, 2020, the capacity was extremely limited. Plaintiffs' ability to accommodate their pre-COVID-19 number of paying customers was utterly decimated.

100.   During the policy period, the applicable Closure Orders and Stay-at-Home Orders prohibited mass gatherings, like ones that were once routinely held at Subaru Park. Though the orders had certain exceptions for professional sports teams to allow fans, if and as allowed by the Leagues in which the teams operate, the teams, including the Philadelphia Union, were still required to comply with health department guidelines on social distancing that highly impacted the number of fans allowed to be inside of Subaru Park during any games or matches.

101.   Additionally, many governmental bodies specifically found that COVID-19 causes property damage when issuing Closure Orders. *See* N.Y.C. Emergency Exec. Order No. 100, at 2 (Mar. 16, 2020)[53] (emphasizing the virulence of COVID-19 and that it "physically is causing property loss and damage"); N.Y.C. Emergency Exec. Order No. 103 at 1 (March 25, 2020)[54] ("actions taken to prevent the spread of COVID-19 "have led to property loss and damage"); Harris Cty. Tex. Office of Homeland Security & Emergency Mgmt., Order of Cty. J. Lina Hidalgo, at 2 (Mar. 24, 2020)[55] (emphasizing that the COVID-19 virus can cause "property loss or damage" due to its contagious nature and transmission through "person-to-person contact, especially in group

---

[53] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (last visited February 14, 2022).
[54] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-103.pdf (last visited February 14, 2022).
[55] https://www.taa.org/wp-content/uploads/2020/03/03-24-20-Stay-Home-Work-Safe-Order_Harris-County.pdf (last visited February 14, 2022).

settings"); Napa Cty. Cal. Health & Human Service Agency, Order of the Napa Cty. Health Officer (Mar. 18, 2020)[56] (issuing restrictions based on evidence of the spread of COVID-19 within the Bay Area and Napa County "and the physical damage to property caused by the virus"); City of Key West Fla. State of Local Emergency Directive 2020-03, at 2 (Mar. 21, 2020)[57] (COVID-19 is "causing property damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Oakland Park Fla. Local Public Emergency Action Directive, at 2 (Mar. 19, 2020)[58] (COVID-19 is "physically causing property damage"); Panama City Fla. Resolution No. 20200318.1 (Mar. 18, 2020)[59] (stating that the resolution is necessary because of COVID-19's propensity to spread person to person and because the "virus physically is causing property damage"); Colorado Dep't of Pub. Health & Env't, Updated Public Health Order No. 20-24, at 1 (Mar. 26, 2020)[60] (emphasizing the danger of "property loss, contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged periods of time"); Sixth Supp. to San Francisco Mayoral Proclamation Declaring the Existence of a Local Emergency, 26 (Mar. 27, 2020)[61] ("This order and the previous orders issued during this emergency have all been issued … also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time"); and City of Durham NC, Second Amendment to Declaration of State of Emergency, at 8 (effective Mar. 26, 2020)[62] (prohibiting entities that

---

[56] https://www.countyofnapa.org/DocumentCenter/View/16687/3-18-2020-Shelter-at-Home-Order (last visited February 14, 2022).

[57] http://cityofkeywest-fl.gov/DocumentCenter/View/1660 (last visited February 14, 2022).

[58] https://www.wsh-law.com/wp-content/uploads/2020/03/oakland-park-emergency-order-03-19-20.pdf?x82805 (last visited February 14, 2022).

[59] https://www.pcgov.org/AgendaCenter/ViewFile/Item/5711?fileID=16604 (last visited February 14, 2022).

[60] https://www.pueblo.us/DocumentCenter/View/26395/Updated-Public-Health-Order---032620 (last visited February 14, 2022).

[61] https://sfgov.org/sunshine/sites/default/files/sotf_061020_item3.pdf (last visited February 14, 2022).

[62] https://durhamnc.gov/DocumentCenter/View/30043/City-of-Durham-Mayor-Emergency-Dec-Second-Amdmt-3-25-20_FINAL (last visited February 14, 2022).

provide food services from allowing food to be eaten at the site where it is provided "due to the virus's propensity to physically impact surfaces and personal property").

102.  As a result of the actual presence of COVID-19 at Plaintiffs' Insured Locations, the physical damage or loss caused by COVID-19 and the resulting Pennsylvania Closure Orders, Plaintiffs' ability to operate its business at the Insured Locations was destroyed. Even where Plaintiffs were permitted to resume some, but not all, of their business activities, Plaintiffs came nowhere close to operating at their pre-COVID-19 level.

**D.** **Plaintiffs' Business Was Interrupted and Their Events Cancelled Due to the Actual Presence of COVID-19**

103.  The actual presence of COVID-19 caused direct physical loss or damage to Plaintiffs' properties, by: (i) causing direct physical loss or damage to Subaru Park and the other Insured Locations; (ii) denying use of and damaging Subaru Park and the other Insured Locations; (iii) requiring physical repair and/or alterations to Subaru Park and the other Insured Locations; and (iv) by causing a necessary suspension of operations during a period of restoration.

104.  The presence of communicable disease in a community, evidenced by infection rates, makes it more probable than not that COVID-19 was transferred in the air and to objects and surfaces. COVID-19 spread is logarithmic.

105.  Because of the spread and/or presence of COVID-19, the functional spaces in Subaru Park and the other Insured Locations was diminished. The Philadelphia Union was scheduled to host eighteen (18) home matches at Subaru Park during the 2020 season. However, due to the spread and/or actual presence of COVID-19 at Subaru Park and the other Insured Locations, the Philadelphia Union was only able to play nine (9) home games, only five (5) of which were able to host any fans (limited to 2,500 or fewer fans). The canceled games were not rescheduled.

106.  The combined number of fans that Subaru Park was able to host for the drastically reduced number of Philadelphia Union home games in 2020 was less than a single game's worth of fans that would attend in a regular, non-COVID-19-plagued year.

107.  For Philadelphia Union home games, before the COVID-19 pandemic, Subaru Park was typically filled to capacity of 18,500 paying fans. In October 2020, Subaru Park was permitted to reopen in a limited capacity, but Plaintiffs were limited to hosting less than approximately 10,000 total paying fans in all games combined.

108.  Almost all business operations of Plaintiffs,' most of which involve large gatherings at the insured properties, were initially canceled and subsequently substantially restricted from an attendance and operational standpoint.

109.  All of Plaintiffs' business operations were severely negatively impacted.

110.  In 2020, the Philadelphia Union secured the Supporters' Shield, winning the first title in the Club's history. Ordinarily, this success would have enabled Plaintiffs to sell out home games more regularly at Subaru Park, obtain lucrative sponsorship deals, and to enjoy substantially increased merchandise sales to paying fans during the home games at Subaru Park. Plaintiffs were severely limited in their ability to realize these sources of revenue that would have accompanied the Philadelphia Union's success due to COVID-19.

111.  Plaintiffs expended significant sums of money in order to repair the physical loss or damage and the infestation on the surface of their Insured Locations.

112.  To repair the physical loss or damage resulting from the intrusion of COVID-19 on the surfaces and in the air caused by COVID-19, Plaintiffs made numerous operational and physical changes and/or structural alterations to Subaru Park and the other Insured Locations.

113.  In order to reopen the stadium in October 2020, numerous measures were taken to effectively eliminate staff-to-fan contact. Fans were required to park in pre-paid socially distanced parking lots nearest to their seating locations. Prior to entry, fans were required to have their temperature scanned and show mobile tickets after clearing walk through metal detectors which were installed to ensure a touchless security screening. Signage and audible prompts regarding the stadium's COVID-19 protocol were apparent throughout the stadium. These mitigation measures cost money to install and operate.

114.  Plaintiffs initially set up a one-way traffic flow on the concourse. Additionally, there were one-way vomitories from the concourse to the seating area. Distancing markers and plexiglass were found at all points of sale, reception desks, and other locations where face to face contact cannot be avoided. Cashless payment options are required. For some games, the concourse was divided into two halves and fans were required to stay in their designated half of the concourse.

115.   Many touch-free sanitizing stations were bolted and installed throughout the covered properties including at all entrance points. New equipment, machines, and a computer system to measure individuals' temperatures and monitor people specifically for COVID-19 were put in place at the entryway of Subaru Park. Protective shields/dividers were found at all concession stands and retail store checkout areas. The locker rooms, suites, press box, and other areas were repurposed or remodeled to permit additional spacing for social distancing. Chairs, tables, and/or other furniture were removed or relocated, and all food and beverage items were packaged. Space was increased between seats throughout the bowl and tickets and parking passes converted to an exclusively mobile format. Concessions required cashless and touch-free payment methods to be used.

116.  Even the bathroom experience at the stadium now have touchless toilets, sinks, paper towels and hand sanitizer. Every other bathroom sink and urinal was blocked off.

117.  Increased cleaning efforts to all surfaces, particularly high touch surfaces, are frequently implemented by dedicated staff members throughout the Insured Locations using electrostatic sprayers.

118.  The Philadelphia Union's training schedule was also dramatically altered in order to return to team training by way of a phased approach. Between May and August 2020, the team shifted from a voluntary phase of individual training to small group training with cohorts of three (3) to five (5) athletes using a gridding system with no more than six (6) players per field and, eventually, to full team training. During the initial phases of this revised schedule, the team practiced out of Wilmington and New Castle Delaware. At the Chester Training Facility, the drinking fountains were blocked to reduce touch contact risks and players are only permitted to eat packaged foods. Each player was assigned a water bottle or sports drink to be placed upright to avoid the risk of infestation.

119.  At the office building, two air sanitizers were installed (one in each fitness room); two thermal temperature screening devices were installed (one at the main entrance and one at the garage entrance); the roof top air handler was replaced; air filter changes were made; plexiglass was installed at the security desk and in the café and common area furniture was removed from the ground floor. The café re-opened on a hybrid schedule in October of 2020 without sit-in dining and restricting sales to to-go items only. Additional day porter staff were hired with their tasks dedicated to high touch areas in the common areas. Floor markings and directional signage was erected. Building maps and return to work plans were circulated to tenants setting forth ingress and egress directional flow plans for traveling throughout the building. Rapid testing of employees,

staff members and employees of tenants was performed along with temperature taking prior to entry. All contractors working at the office building were also required to comply with COVID-19 screening prior to entry.

120.  Thus, because the spread and presence of COVID-19 altered the structure of the physical spaces, property surfaces and ambient air of the Insured Locations, there have been even more obvious structural alterations, changes and/or repairs made to Subaru Park and the other Insured Locations so that Plaintiffs can continue their business after experiencing direct property damage caused by COVID-19 and so that Plaintiffs may avoid the imminent threat of further property damage.

121.  Plaintiffs suffered substantial losses due to the actual physical presence of COVID-19 and the ongoing threat of immediately impending COVID-19, which forced the closure of Subaru Park and the other Insured Locations, and the subsequent Closure Orders which kept these properties closed in full for months and severely limited their function and ability to accommodate paying customers and fans when they were permitted to reopen.

**E.     Plaintiffs' "All-Risks" Policy Covers Plaintiffs' Claims**

122.  The Policy is an All-Risks policy, meaning that it provides coverage for damage to property and lost income from all types of risks unless they are specifically excluded.[63] . . ."

123.  Plaintiffs' Insured Locations under the Policy include the Subaru Park stadium located at One Stadium Drive, the Training Fields and Facility located at 2525 Seaport Drive and the Wharf at Rivertown Office Building located at 2501 Seaport Drive ("the Office Building").

---

[63] None of the exclusions in the Policy apply to Plaintiffs' claims.

### 1. COVID-19 Triggered Coverage under the "All-Risks" Policy

124. Coverage under the Policy is triggered due to the actual presence of COVID-19 at Subaru Park, the Training Fields and Facility and the Office Building and the ongoing threat of immediately impending COVID-19 and resulting loss or damage.

125. COVID-19caused direct physical loss and physical damage, as described above, to property, including Plaintiffs' properties.

126. Due to the losses covered by the Policy, Plaintiffs submitted claims to Defendant.

127. Despite Plaintiffs' adherence to all terms of the Policy in accordance with the contract terms, Defendant denied Plaintiffs' claims for Business Interruption losses by letter dated June 17, 2020.

128. Defendant swiftly sent this letter denying coverage and benefits owed under the Policy without conducting any meaningful investigation and in spite of clear policy language affording coverage for Plaintiffs' losses. Defendant never even visited the Insured Locations to assess whether the Insured Locations sustained property damage or losses of any kind.

129. Defendant's letter misstates that Plaintiffs did not sustain direct physical loss or damage to property at or within 1,000 feet of their premises and that no civil authority impacted Plaintiffs' operations due to direct physical loss or damage to property.

130. Defendant's letter also erroneously invokes the "Acts or Decisions" Exclusion despite the fact that the exclusion expressly "does not apply to ensuing loss or damage caused by or resulting from a peril not otherwise excluded." COVID-19 is a cause of loss which is not excluded by any provision of the Policy.

131. Individuals with COVID-19 or otherwise carrying the coronavirus were physically present at Plaintiffs' premises. Coronavirus-containing fomites (*i.e*., inanimate objects),

respiratory droplets, and nuclei from those individuals came into contact with, adhered to, and attached to the surfaces of the property upon which they landed, including without limitation, the real property, furniture, fixtures, and personal property at the premises.

132.  The coronavirus is ubiquitous—it spread throughout all fifty states. Some individuals carry it with no symptoms; it cannot be visibly detected on surfaces and can remain on surfaces for weeks. The prolonged presence of COVID-19 in the areas encompassing Plaintiffs' Insured Locations made it unavoidable that individuals with COVID-19 or otherwise carrying the coronavirus, including guests, employees, contractors, and other business visitors, would be physically present at the Insured Locations on various dates since the earliest days of the pandemic. Plaintiffs' employees and staff members as well as guests and patrons reported COVID-19 positive test results and their employees quarantined due to direct exposure.

133.  Coronavirus or coronavirus-containing fomites, respiratory droplets, and nuclei physically alter property to which they adhere, attach, or come in contact including without limitation by altering the surfaces of that property and/or by making physical contact with those previously safe, inert materials dangerous.

134.  When individuals carrying the coronavirus breathe, talk, cough, or sneeze, etc., they expel aerosolized droplet nuclei that remain in the air and, like dangerous fumes, make the premises unsafe and affirmatively dangerous. In addition, the coronavirus physically alters the air. Air inside buildings that was previously safe to breathe but can no longer safely be breathed due to coronavirus and COVID-19, has undergone a physical alteration.

135.  The presence of COVID-19 at the premises prior to any Closure Order being issued, and thereafter as well, is not hypothetical. Persons who tested position for COVID-19 were present at the covered premises on various date in 2020 and 2021. Persons who came into contact with

persons diagnosed with COVID-19 were present at insured property on various dates during 2020 and 2021.

136.  Although not noticeable to the naked eye, COVID-19 rendered the covered premises uninhabitable, highly dangerous to use and nearly eliminated or destroyed their functionality.

137.  Coronavirus droplets were conveyed from infected persons (whether symptomatic, pre-symptomatic, or asymptomatic) to solid surfaces, including, but not limited to furniture, doors, floors, bathroom facilities, equipment, and supplies, and into the air and HVAC system at the insured properties, causing damage and alteration to physical property and ambient air at the premises. Aerosolized coronavirus entered the air in Plaintiffs' properties.

138.  The presence of the coronavirus and COVID-19, including, but not limited to coronavirus droplets or nuclei on solid surfaces and in the air at the insured property, caused direct physical damage to physical property and ambient air at the premises. Coronavirus, a physical substance, attached and adhered to Plaintiffs' properties, and by doing so, altered that property. Such presence also directly resulted in loss of functionality of that property.

139.  The physical losses to Plaintiffs' properties include without limitation the rendering of the insured property from a satisfactory state to a state dangerous and/or unsatisfactory for use because of the fortuitous presence and effect of the coronavirus, fomites, and respiratory droplets or nuclei directly upon the property.

### 2.  *Multiple Coverages Are Triggered Under the "All-Risks" Policy*

140.  The Policy's Premises Coverages contain a prefatory clause providing that the coverages are triggered not only by direct physical loss or damage to the actual premises shown in the Policy Declarations, but also by direct physical loss or damage within 1,000 feet of those premises. *See* **Exhibit 1** at 89.

141.  Under the Policy, Defendant promised to pay Plaintiffs' Business Income and Extra Expense Coverage. Federal agreed to pay for the actual business income loss incurred due to the actual impairment of operations; and extra expense incurred due to the actual or potential impairment of operations during the period of restoration caused by or resulting from "direct physical loss or damage" to the Insured Locations. *See id.*

142.  Due to the spread and actual presence of COVID-19 at Subaru Park, the Training Fields and Facility and the Office Building, Plaintiffs suffered Business Income and Extra Expense losses as a direct result of physical loss and damage that is insured by the Policy as described above. The "Period of Restoration" began on or about March 12, 2020, when Major League Soccer suspended all games effective immediately.

143.  Defendant also promised to pay Plaintiffs Business Income and Extra Expenses that result when existing ingress to or egress from a premises shown in the Declarations is prevented due to the actual impairment of operations; and extra expense incurred due to the actual or potential impairment of operations due to  "direct physical loss or damage" to property within one mile of the Insured Locations. *See id.* at 61.

144.   Due to COVID-19 and the physical loss and damage of COVID-19 at other nearby properties, Plaintiffs' businesses were interrupted because of the total or partial prevention of ingress or egress to and from Subaru Park, the Training Fields and Facility and the Office Building.

145.  Under the Policy, Defendant also promised to pay Plaintiffs' business income due to the impairment of operations; and extra expense incurred due to the actual or potential impairment of operations directly caused by the prohibition of access to the insured premises or a dependent business premise by a  civil authority. The prohibition of access by a civil authority is to have

36

resulted from direct physical loss or damage to property away from but within one mile of the insured premises. *See id* at 62.

146. Due to the actual physical presence of COVID-19 at and nearby Subaru Park, COVID-19 was present in the immediate area of the insured premises. Subaru Park is located approximately 2.7 miles from Crozer Chester Medical Center, 2.6 miles from Community Hospital and 4.8 miles from Taylor Hospital.

147. On information and belief, COVID-19 was present at these hospitals, and has caused physical loss and damage at these hospitals. The Closure orders were issued, at least in part, in response to dangerous physical conditions and damage at these hospitals, and to prevent further damage at these hospitals.

148. Under the Policy, Defendant promised to pay Plaintiffs' business income due to the impairment of operations; and extra expense incurred due to the actual or potential impairment of operations caused by or resulting from physical loss or damage by at a Dependent Business Premises.[64] *See id* at 63.

149. Subaru Park, the Training Fields and Facility and the Office Building rely upon other entertainment venues, vendors, and advertising companies to deliver services and to attract customers that suffered "direct physical loss or damage" which required them to close, and in turn, caused Plaintiffs to incur business income and extra expense.

150. Not only were the Dependent Business Premises of these vendors, advertisement companies and others forced to close, but the worldwide sports calendar as a whole was drastically affected as a result of COVID-19. Naturally, Plaintiffs' fans were unable to gather at any one of

---

[64] The Policy defines "dependent business premises" as "premises operated by a person or organization other than you on whom you or others depend on to deliver materials or services to you …or attract customers to your business." *See* **Exhibit 1** at 110.

the Dependent Premises to watch them play and forced Plaintiffs to incur a high volume of covered losses.

151.  Due to the actual presence and spread of COVID-19 causing direct physical loss or damage, and the ongoing threat of immediately impending physical loss or damage (as described above) at Subaru Park, the Training Fields and Facility and the Office Building, Plaintiffs incurred costs to temporarily protect the insured property from further loss or damage, including costs associated with having to close down and subsequently reopen Subaru Park, the Training Fields and Facility and the Office Building and the costs to make these properties safe. The Policy provides this "Sue and Labor" coverage for these costs  to the extent they are reasonable. *See* **Exhibit 1** at 102. The costs incurred by Plaintiffs as set forth above were not only reasonable but also necessary.

152.  In addition to the losses and coverages described above, Plaintiffs' COVID-19 losses are covered under any and all other coverages under the Policy that may apply. These include, but are not limited to, Preparation of Loss Fees. *See id* at 66.

### 3.  No Exclusion Applies Which Affects Coverage

153.  The Policy contains no exclusion which limits or bars coverage for the actual presence of COVID-19 or the threat created by that presence at and near Subaru Park, the Training Fields and Facility and the Office Building, the physical loss and damage to the Insured Locations, and/or the business interruption losses which resulted from the physical loss and damage to property.

154.  To the extent the Court finds that any exclusion(s) apply, they are unenforceable.

155.   Although the Business Income With Extra Expense coverage in the Policy includes a "Pollutant Clean-Up or Removal" exclusion, labeled a "Loss Payment Limitation," that exclusion does not apply to Plaintiffs' claims.

156.   The Pollutant Clean-Up or Removal exclusion applies to extra expense incurred to clean up or remove "Pollutants" from land or a building, or incurred for "testing for, monitoring, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of **pollutants**."  See **Exhibit 1** at p.70. Thus, the exclusion only potentially applies to certain "extra expenses," not any of the business interruption or other losses claimed by Plaintiffs.

157.   Notably absent from the definition of the Policy's definition of **"Pollutants"** is the term "virus."[65]  In fact, the definition does not refer to any biological materials, bacteria, pathogens, or organisms of any kind. The term **"Pollutants"** under the policy cannot reasonably be interpreted to include virus.

158.   Furthermore, the exclusion specifically exempts any "extra expense that you incur to the extent it reduces the amount of a covered business income loss that otherwise would have been payable under this contract." *See* **Exhibit 1** at p.70. Because Plaintiffs' extra expenses were incurred to respond to and reduce covered business income loss, the exclusion would not apply to those expenses.

159.   The Acts or Decisions exclusion referenced in Defendant's letter of June 17, 2020 is wholly inapplicable.

---

[65] The Policy defines "**Pollutants**" to mean "any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fibers, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed. **Pollutants** does not mean fungus."  *See* **Exhibit 1** at 123.

### 4.   The Lack of a Virus or Communicable Disease Exclusion

160.  At the same time, the Policy does not include, and is not subject to, any exclusion for losses caused by the spread of viruses or communicable diseases.

161.  The lack of a virus or communicable disease exclusion *is significant* because the insurance industry has recognized that the presence of virus constitutes physical damage to property since at least 2006. When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm, The Insurance Services Office ("ISO"), issued a statement on July 6, 2006 (following the SARS epidemic in 2003) to state insurance regulators through an ISO Circular.[66] The Circular included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

162.  The ISO even drafted a form exclusion, Form No. CP 01 40 07 06, that could be inserted into insurance carriers' policies to exclude coverage for losses caused by viruses or communicable diseases entitled "Exclusion of Loss Due to Virus or Bacteria" ("the 2006 ISO exclusion,)" which was circulated on a widespread basis and part of the above-referenced Circular.

163.   Federal was aware of the 2006 ISO Circular and form exclusion.

164.  Federal could have easily included the 2006 ISO exclusion, or even a variation of the ISO form exclusion in the Policies to bar coverage for losses caused by viruses spread from

---

[66] The July 6, 2006 Circular, incorporating the 2006 ISO exclusion therein, is appended hereto as **Exhibit 2.**

person to person or communicable diseases but is believed to have consciously and deliberately chosen not to do so.

165. Without a virus or communicable disease exclusion in the Policy, Plaintiffs reasonably believed and expected Federal to pay their claims. There was no reasonable expectation on the part of the Plaintiffs that losses caused by either "virus," or "Communicable Disease" would be excluded from coverage.

166. Federal's ongoing refusal to provide coverage is in direct breach of the Policy and Plaintiffs' reasonable expectation of coverage, and consequently has caused Plaintiffs to incur significant expenses.

167. Plaintiffs' damages include but are not limited to the reduction of revenue and income related to the cancellation and/or indefinite postponements of Philadelphia Union home games, concerts, private special events, tours, youth camps, and public training camps. Plaintiffs' damages further include, but are not limited to, the reduction of revenue and income related to: the fact that the Philadelphia Union had games with limited or no fans; the stadium retail stores' and concession stands' limited sales due to the cancelled events and/or fan-free events or limited-fan events; the cancellation, reduction, or seasonal postponement of brand sponsorships due to the cancelled or limited-capacity or fan-free events and games; the lack of the ability to have sponsor activities at the Training Fields and Facility due to the training camp being closed to the public; and a sizable increase in travel expenses. Plaintiffs' damages are further related to the inability to profit from the Philadelphia Union's success in clinching the overall record of Major League Soccer for the 2020 regular season and winning the Supporters' Shield because of direct physical loss or damage brought about by COVID-19.

## V.    CLAIMS ALLEGED

### COUNT I

### Declaratory Judgment

168.  Plaintiffs, Keystone Sports and Entertainment LLC; FC Pennsylvania Stadium LLC; Pennsylvania Professional Soccer LLC; Rivertown Developers, L.P.; Rivertown TCI, L.P. and KSE U2 LLC, incorporate by reference the allegations contained in Paragraphs 1-167 above, as if set out in full herein.

169.  Plaintiffs seek the Court's declaration of the parties' rights and duties under the Policy pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201.

170.  A justiciable controversy exists between Plaintiffs and Defendant regarding the availability of coverage under the Policy for Plaintiffs' claims.

171.  The controversy between Plaintiffs and Defendant is ripe for judicial review.

172.  Therefore, Plaintiffs seek a declaration from this Court that:

a.  The various Policy coverage provisions identified in this Complaint are triggered by Plaintiffs' claim;

b.  No Policy exclusions apply to prohibit or limit coverage for Plaintiffs' claims; and

c.  The Policy covers Plaintiffs' claim.

### COUNT II

### Breach of Contract and Duty of Good Faith and Fair Dealing

173.  Plaintiffs, Keystone Sports and Entertainment, LLC; FC Pennsylvania Stadium LLC; Pennsylvania Professional Soccer LLC; Rivertown Developers, L.P.; Rivertown TCI, L.P.; and KSE U2 LLC, incorporate by reference the allegations contained in Paragraphs 1-172 above as if set out in full herein.

174.  The Policy constitutes a valid and existing contract of insurance requiring Defendant to properly compensate Plaintiffs for their losses.

175.  Any ambiguity in its terms or doubts as to the application of coverage is to be resolved in favor of Plaintiffs and coverage granted in accordance with their reasonable expectations.

176.  Despite Plaintiffs reasonably believing and relying on the terms of the Policy to confer coverage in the event that they were forced to cease and/or reduce operations as a result of the loss or damage of the Insured Locations brought about by viruses such as COVID-19 and Closure Orders issued because of said loss or damage brought about by viruses such as COVID-19, Defendant has breached the Policy and violated their duty of good faith and fair dealing by failing to pay Plaintiffs for their business interruption losses.

177.  Despite Plaintiffs reasonably believing and relying on the terms of the Policy to confer coverage in the event that they were forced to cease and/or reduce operations as a result of the loss or damage of the Insured Locations brought about by viruses such as COVID-19 and Closure Orders issued because of said loss or damage brought about by viruses such as COVID-19, Defendant has breached the Policy by failing to pay Plaintiffs for their business interruption losses.

178.  Plaintiffs sustained damages due to the actual physical presence of COVID-19, the existence and ongoing threat and spread of COVID-19, and the Closure Orders prohibiting large gatherings resulting from COVID-19, but Defendant has failed to comply with their obligations and failed to compensate Plaintiffs for their claim.

179.  As a direct and foreseeable result of Defendant's breach of contract and duty of good faith and fair dealing, Plaintiffs have been deprived of the benefits due to them as a result of their covered loss, including, but not limited to the Business Income and Extra Expense, Ingress and

Egress, Civil Authority, Dependent Business, Preservation of Property and Extra Expense Coverage.

180.  Additionally, Plaintiffs suffered other consequential damages by reason of damage to their business operations for an amount in excess of the coverage set forth in the Policy, including, but not limited to damage to, their business operations, reduction in value, profitability of business operations and assets, and the ability to capitalize on their winning 2020 regular season record.

181.  Consequential damages for breach of the Policy were reasonably contemplated by the parties at the time the Policy was issued.

182.  Plaintiffs were required to retain the services of attorneys to commence this action and are further entitled to attorneys' fees and costs.

## VI.   REQUEST FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant as follows:

1)    A declaration from this Court that:

a.    The various coverage provisions identified in this Complaint are triggered by Plaintiffs' claims;

b.    No exclusion in the Policy applies to prohibit or limit coverage for Plaintiffs' claims; and

c.    The Policy covers Plaintiffs' claims.

2)    For actual, special, compensatory, and consequential damages against Defendant in an amount to be proved at trial in excess of the $50,000;

3)    Pre- and post-judgment interest as provided by law;

44

4)   An award of attorneys' fees and cost of suit incurred; and

5)   For such other and further relief as the Court deems proper.

### VII.   JURY TRIAL DEMANDED

Plaintiffs respectfully request a trial by jury consisting of twelve members on all claims, issues, and disputed issues of fact so triable.

Date: March 3, 2022                    Respectfully submitted,


/s/ Marni S. Berger
Robert J. Mongeluzzi; ID No. 36283
Jeffrey P. Goodman; ID No. 309433
Marni S. Berger; ID No. 309303
Samuel B. Dordick; ID No. 322647
**SALTZ MONGELUZZI &**
**BENDESKY P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-496-8282
rmongeluzzi@smbb.com
jgoodman@smbb.com
mberger@smbb.com
sdordick@smbb.com


Adam J. Levitt
Amy E. Keller*
Daniel R. Ferri*
Mark Hamill*
Laura E. Reasons*

**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
dferri@dicellolevitt.com
mhamill@dicellolevitt.com
lreasons@dicellolevitt.com
Kenneth P. Abbarno*
Mark A. DiCello*
Mark Abramowitz*

**DICELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio 44060
Telephone:  440-953-88
kabbarno@dicellolevitt.com
madicello@dicellolevitt.com
mabramowitz@dicellolevitt.com

Mark Lanier*
Alex Brown*
Skip McBride*
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas 77064
Telephone:  713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
skip.mcbride@lanierlawfirm.com

Timothy W. Burns*
Jeff J. Bowen*
Jesse J. Bair*
Freya K. Bowen*
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels*
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas 77057
Telephone:  713-917-0024
douglas.daniels@dtlawyers.com

*Applications for admission *pro hac vice* to be filed.